Your Honor, this is the first case of the morning, Fall 210-4448. People of the State of Illinois v. Christy Lentz. On behalf of the Iowans, Mr. Douglas Johnson. On behalf of the Iowans, Ms. Diane Johnson. Thank you, Mr. Johnson. May it please the Court, Counsel. My name is Doug Johnson and I represent Christy Lentz, the defendant. Ms. Lentz is currently serving 50 years for the first degree murder conviction of her father, Michael Lentz. I'd like to address the first issue we raise in the brief regarding the suppression of the statements made by Ms. Lentz. I'm going to take it a little bit out of order so I have time to get to what I believe is the heart of the case. The voluntariness of the confession statement and the use of Taylor, the 7-year-old daughter of the defendant, as a means to extract those statements by law enforcement. The standard of review is to make a manifest plea, is it not? I believe that this Court, yes, must defer to any findings of fact that are not manifestly erroneous, but also this Court can make a de novo review based on those facts. Now, as I'm sure the Court is aware, the statement, to show that the statement wasn't voluntary, we have to show that it was a product of inducement or unlawful coercion. Factors involved in that include the defendant's age, intelligence, and education, and I don't believe there's anything special about that here. But also the physical condition of the defendant at the time of the interrogation. She had been up since 4.45 in the morning, and she had been drinking that day. This began in her driveway or in Chuck Manouskas' driveway at 10 o'clock at night. Long day. She had no experience with the criminal and justice system. So, and also I think Deputy Ewalds, if I'm pronouncing that right, said she did appear tired, and one would expect her to be fatigued. She was the primary source if the police needed to contact someone relative to Mr. Weiss's disappearance. They were, why did they think she was a person of interest? Their position would be they had been to the business that day, and they had found his body, and they would say we needed to talk to him. My point is, why would she think that she was a suspect if she was the one who made the contact? Normally when somebody reports something to the police, they expect the police to get back to them. If they don't, then they're kind of ticked at the fact that the police don't respond. At trial, she knew about what was going on. The presentation at trial was that this happened in self-defense. So since May 22nd, she had been engaged in activities that certainly are not good for the defense and were used against her at trial. But wait a minute. Let's talk, let's go back and talk about your statement. You're talking about an involuntary statement. I am. You basically, you basically have your two different statements, do you not? We have one pre-Miranda, and then we have one post-Miranda. Yes. And the pre-Miranda statement, she's pretty happy. She's pretty, you know, cooperative. There's no problems. You know, they ask her all of the questions. Oh, let's go back. At one point he says, you know, you came here on your own free will. You know, we've given you something to eat and drink. We've offered you all of this. Are you saying that that first statement post-pre-Miranda was involuntary? I am, especially if not right at the beginning, perhaps. Well, first I would say at the moment she asks, there are several responses to your question, at the moment she asks or states Taylor has to go to bed soon, and they completely ignore that statement. Didn't they reassure her that she was being cared for? Absolutely not, Your Honor. They never told her what was going on. They could have said, you know, Taylor's down with a child advocate. Taylor's in a very comfortable room right now. Taylor's playing with stuff. Never anything like that. The only reassurance is on page 311, and that's where they finally say she's with Jill or she's with someone. But there is nothing. There is clearly our position. Within about five minutes into the questioning, that's when they say, okay, how did you get here tonight? And then at that point they say to her, okay, all right, so everything's okay. And she said, well, my daughter needs to go to bed soon. And they say, okay, I'm sure she's being very occupied. And she said, I'm sure. And then she goes on to talk to them without an appearance from my viewing the video or without an appearance of being pretty stressed out. At that point in the very beginning, pre-Miranda, she's pretty happy, isn't she? Well, the state points out she's laughing. I believe that's nervous laughter. And also they say they don't say, is everything okay? They say, and you did say it, you said so everything is okay just as you read it. So everything is okay. Yes. So everything is okay. And the answer to that from Christy was not, yes, it is. It was, my daughter needs to go to bed soon. Right. So instead of discussing that with her or saying, okay, let's look into that. Hey, would you like to go back to your house, take her home, and we can talk there? Okay, let's make sure you know we have a bed down there. She can be taken care of. Instead, she quickly says, I'm sure. And then he says, back to this. So I believe there has to be an assessment over this long. I'm sorry. At that point, we can look at it as a custodial interrogation. If you're looking at it as a custodial, it sounds like you are. Do you believe she did not feel like she was free to leave at that point? At that point, yes. If we get into the Miranda violation. Pre-Miranda. Pre-Miranda. Right. And it's just they're questioning her, and she's pretty happy, and she's talking to them. But do you believe at that point that she felt that she were a suspect and that she was not free to leave? Absolutely. She's taken, going back to that. She's taken at 10 o'clock at night from a driveway with six police officers come to her. But all six didn't take her. All six didn't take her. But the show of force, she sees them all, which differentiates this from the Ali case cited by the state. They all see her. I'm sorry. She sees them. They are all armed, and they have badges. So while they aren't in uniform, these are police officers. We know it. And look what they do then. They take her, and she is placed in the back of a police car, or a car, she and Taylor, with police officers on both sides of her. That sounds like the indicia of a traditional arrest. And then they go to the station, what has been called a coercive atmosphere, and they go back into, through a nonpublic means. The state says, well, they had to park somewhere. I submit the police can park wherever they want, and they could have parked and then taken her through a public way. But they take her into this private area. They take her up to a secluded nonpublic room, the second floor. And in there, they sit her down, and I submit to you, she could have, of course, anyone could always say, hey, can I go home now? But that would just be, that's almost like someone sitting in a jail cell saying, hey, by the way, I'm sick of this. I want to go home. She did what she could. When did she ever, that's the missing link, that's the problem I have with the argument. Even your response to it, you said Taylor needs to go home. Did she ever say, you know, I'd like to leave and take my daughter home now if she needs to rest? Did she ever express a desire to leave? Page 111, before the Miranda warning, she says, could I, is there any way I could take my daughter home? I can get the exec court like that. Go on. She says, is there any way I could take my daughter home soon to put her to bed because it's kind of late? And the response to that is, well, we're just trying to get through all of this now, so. And then they break and Miranda dies, interestingly enough. Now, you say she's almost in effect in custody. Doesn't at some point, doesn't she take a break and go outside, smoke a cigarette? Does she take? And she's outside talking to the other people? With, no, she is outside where a couple things happen. She is with Officers Kubish and Weida. They accompany her out. Now, I know that's all that happened. That's not necessarily custody. But they accompany her out on the smoking break, so they're right there with her. Were they smoking themselves? I don't know. I'm sorry, but she's on a smoking break. I know they say they smoke. I don't know if they're smoking at that time. She's out there, and that's when she sees Taylor on a bench bitten by mosquitoes, being bitten by mosquitoes. And that concerns her. And that does send a message to her, too. Hey, my daughter may not be being taken care of. On top of the message that she is never told until way, way later that Taylor is okay, one question I've asked myself about this case is, is it reasonable for a person to feel that a child wouldn't be safe in a police station? And the answer is, here, she was never reassured. She showed concerns from the get-go, and she certainly did ask to leave. I think the case law is clear. Merely being interviewed in a police department with officers present in a private area is not in and of itself a custodial interrogation. I think the law is very clear on that. I don't think that's a winning argument for you in and of itself because that's where the police talk to people. And I wouldn't argue. If that's all we had here, I wouldn't argue. All right, so what is it about this case? In light of the fact she goes outside, they're all smoking, she's talking to other people. If you were in jail, you wouldn't be allowed to do that, obviously, if you were in a custodial setting there. So why is this case different? Okay, first of all, I don't believe she's talking when she's out there, but I go back as far as the custody issue. She is taken at 10 o'clock at night. She is taken in a police car with officers on each side of her. With no cage in the police car, correct? No cage, but four officers, one on each side of the machine. When you say taken, did they say, okay, you have to come with us? You say taken, it was like that implies that she went against her will. What evidence is there that she did not voluntarily accompany them? The totality of the circumstances, coming, the law is not, she doesn't have to say, I am not going to go with you, and they have to take her. If we look at everything, the show of force, the put in the back of the police car, the taken into a non-public area, the sitting into a room, and then asking, as I stated earlier, to leave. Is there any way I can take my daughter home? And they said no. After, right away, her saying, my daughter needs to go to bed. I mean, she is a reasonable person, would not believe, especially when they don't answer her questions. She says, my daughter has to go to bed soon. And they don't say yes or no. They say, I'm sure she's very occupied. They use this against her. That's the custody that is different in this case than other cases. Okay. So with that pre-Miranda, pre-Miranda, they ask her, she mentions her daughter, I think, a couple of times, one time, before they go out to smoke. And then I think when they come back to smoke, she mentions her a couple of times. And she said, my daughter needs to get to bed soon. And they say, we're just trying to get all through this all now. And then I think she says something like, my daughter's bitten by a mosquito. So at that point, then they Mirandize her. After they Mirandize her, she gives a statement, this, you know, my dad and I are struggling over the gun. After that statement, there's more mention of her daughter, correct? There's a lot of mention. About eight times? Yes. Did she ever change her statement after that eight times? Did she ever materially change it? Yes. I don't know the changes that happened after each time, but there were new things taken throughout the statement. There's no question that admission of, there's no way to, I don't think there's a way to dissect the statement and decide what parts could go in, what parts can't go in. But did she ever change her statement as to how her father was killed? The final, she changed it from beginning to end of the entire statement. Did she ever say, I killed him because he was getting on my nerves? No. No, she, each time the statement remained that it was basically, in her opinion, self-defense, correct? Yes. So they mention, she mentions a child like three times prior to Miranda. Miranda comes, she gives a statement, and then mentions eight more times, but the statement never changes. It never changes to the extent, Your Honor, as I've said before. It was a self-defense or an accident. I thought she said that she pushed him. In the statement, in the videotape statement, accident would be the best way to catch him. During the conversations that the child was related eight times, it was the police who were telling her, correct me if I'm wrong, that she was wrong when she was saying she would never see Taylor again. Normally, these interrogations are exactly the opposite, where the state says if you don't come forward with the information, you'll never see your child again. So the fact that they're talking about the child eight different times is one thing, but the nature and the timbre of the conversation was not supportive of your position that they were placing her under duress with threats of termination of parental rights, or termination of custody, or visitation, or anything of that nature. So how is the trial court's findings or judgment against the manifest weight when we've got the record, we've reviewed the record, tell us what it is in the record that indicates that this is against the manifest weight of the evidence. All right. I respectfully disagree that the nature and the timbre of the interrogation was simply that it discooperated with us. There is a point where they say very late, she's going to be all right. But look what happens before. It isn't just references to Taylor. It isn't just ignoring, always just ignoring things about Taylor. It was saying things like this. The sooner you tell us what happened, the sooner I can go downstairs and make sure Taylor gets a place to go home tonight. That was after she had already said that there was this accident, correct? I'm sorry? There was this accident and her father was killed. Yes. And after all of those statements about the daughter, did she ever change her account of what happened that evening? Not to the extent, she never changed it. Right. But the statement still, getting back, you know, I know you're going through a lot. But the longer you don't make sense and we can prove otherwise, the longer you're going to be here, the longer Taylor's going to be here. You cited the Lincoln versus Illinois case. Is that case a little different than this case here? Do you think it's the same? It's the same pattern that Justice McClaren, I believe, touched on. But the point, the similarity between the case and the point is that in this case, no, they didn't say, you know what, you are never going to see Taylor again. You don't talk to us. You're never seeing her again. I agree. That didn't happen. So they coerced them with the kids first in Lincoln, then a statement came out. Yes. They said in that case that, you know, the state may or will be cut off to your children. You can't see them from the county jail. Those types of things. But here, Christy is reasonably concerned about her daughter and she just doesn't know what's going on with her and she doesn't know what's going to happen to her. And they are clearly not telling her because they're leveraging it. On page 18. Counselor, your time is up. I have one question relating to the denial of placing before the jury the instruction relating to involuntary manslaughter. Could you relate why you believe there was sufficient evidence to submit the issue to the jury? That they could have used. The jury could have concluded and believe the videotape statement. The videotape statement. They believe the videotape statement. Over the testimonial. How far over the evidence? He wasn't shot in the back of the head. Yes. From a distance. Yes. Twice. Did the coroner or the whomever opined that it's the cause of death indicate that either of the two bullet wounds was lethal? I don't know the answer to that. May I point to one portion of the transcript in response to your earlier questions? Sure. On page 198, they do tell her, quote, I can't tell you what's going to happen with your daughter until you tell me what happened with your dad. Once we get this straightened out, you can see your daughter. I believe that brings that to mind. Thank you. We'll have an opportunity to make the follow-up. Ms. Campbell. Good morning, Your Honors. I'll briefly address your question about the involuntary manslaughter and then concentrate most of my time on the first issue. You're very correct. The involuntary manslaughter was not appropriate. That's for a reckless act, which is conscious disregard. In this case, it's connected with a videotape statement that is both denied by her at trial as being not truthful and physically impossible. Your Honor is correct. The victim was shot twice in the back of the head. The coroner testified it was not a contact wound. So unless – and in the videotape, she says that she did not pull the trigger.  She did not have the gun. So in order to – for there to be credible evidence, the victim would have had to be, you know, ectoplasm man, where the arm can twist around and get far enough away from the back of his head for him to shoot himself twice in the back of the head. That is not physically impossible according to the physical evidence, plus her denial of that statement. So what you're saying is it's not – if the defendant takes a stand and says, I lied to the police, everything I said in my tape statement is untrue, that doesn't rise to the level of credible evidence, you seem to be correct. Well, in conjunction with the fact that it's physically impossible for him to have shot himself twice in the back of the head, and the shot came out through the forehead, so the angle, you know, isn't important on whether he was shot. Second-degree murder instruction, self-defense. Unjustified use of force. Unjustified use of force. In my brief, I list all the alternate, you know, aside from the first-degree murder that she received. So the only one she was denied was the weapon. The weapon was apparently retrieved, was it not? She said it was in his desk drawer. It was not found in the place where – that was part of the reason why the interview with her was going so long. The police had gone back to the location to attempt to find the gun where she had said that it was, and they were unable to find it at that location. I'll go then to the first issue. Briefly, I'm going to address the facts of her being picked up and taken to the station. It was not a custodial situation. Your Honors are correct. At that point, what we have is her voluntary report of her missing father. She is cooperating with the police in answering those questions and trying to find him. Your Honor is correct that Detective Kubish, I believe, goes back and reviews the fact with her on the videotape, saying you came here voluntarily, she's happy, she has her bottle of water, which she's drinking. You know, she's very cooperative. In fact, at one point later in the tape, she says it's good to get together and confer on the information and compile the information. So she's obviously voluntarily cooperating with the police. The fact that she rode in the car is not particularly indicative of any sort of custodial situation. The fact that it was 10 o'clock at night is because the police found the body in the afternoon. They got a search warrant for the business. And so that was the reason it was later in the evening they're going to look for family members to talk to them. How do you respond to your opponent's argument that I think about six police officers converged on their home at the time? What happened was they discovered the father's body in the business. So they want to go back and talk to various family members, et cetera. So they send a number of police officers. I believe it was four out to find Chuck, her boyfriend. He has a criminal record, that sort of thing, so they're going to send more officers out for him. And they send two officers out to look for Christy. The reason that there are six officers present when they're at Chuck's house is because Chuck and Christy are together when they locate him. They had been out to someplace earlier in the evening, and they had just gotten back to Chuck's house when the police come up, pull up behind them. Could she have known in her mind, okay, four for Chuck, two for her? Well, a couple come and talk to her, and some go in and talk to Chuck. I don't think it was ever explained, you know, oh, I'm here for you or whatever. So the appearance to her is that there are six officers there? Correct. So with respect to volunteering, not volunteering, with respect to custodial and, you know, the relevant circumstances, whether it was a custodial interrogation, would that not have made her feel, you know? I don't think so. At this point, it's a missing. She's cooperating on answering missing. She wants to go with them and, you know, help find dad. So, no, I don't think it's in any way she's voluntarily going to police to cooperate with them. Okay. Do you agree with me that there are two types of statements either one pre-Miranda, one post-Miranda? Yes. And that we would look at them differently? Yeah. Actually, she doesn't say anything that's incriminating until well after the Miranda. What happens is that – in the first portion of the interrogation, that if you had been to the business and found the corpse, would suggest that she's not being forthright because that thing was pretty right. And if she was at that business, attending the business, she would have contacted someone to tell them that there was some sort of problem with either her nose or a plastic bin that had a body in it. So when she is answering questions about the business and where she's been and the secretary and so on and so forth, they're weaving a web that she is slowly but inexorably approaching. So to say that it isn't incriminating may be true to the extent that it's not a confession, but those questions in my mind establish – how should I put it? A level of incredulity that she reports someone missing and can't figure out where her father is when there is this stench at the business she supposedly was attending to. The stench at the business doesn't come up until well after the Miranda warnings have been given. So in that sense, I distinguish that because at that point, the officers are attempting to get information on who has access to the business. And at this point and throughout, if you look at the interview on a whole, it's evident that they're much more suspicious about her brother or Chuck and think that they're involved over Christy, particularly when you get toward the end after she's admitted. And this also goes to the voluntariness, which Justice Shuster was talking about. Had her will truly been overborne, she would have said, oh, yeah, Chuck and my brother were involved, because that's obviously the way the police were going and the tenor of their questions. Well, were her prior statements or her statements prior to her being Mirandized submitted in Devin? Because if they were, it must have been because they were relevant material. And if they're relevant material, it means they tend to prove something. And what is it that they tend to prove, that she was guilty of murder? So I think you could say, logically at least, that even though it's not a confession or an admission, it is information. From those questions, they then investigate more, such as Cecilia's, the secretary's, Well, they explored the secretary because they established that she terminated her or ceased to be present on premises after a certain date that was prior to the disappearance. Yeah, and no prior employees still had keys or access. You know, which of the siblings might have had access or been there. That's the way they're working on, prior to the Miranda. Counsel, your opponent implied at some point that really the defendant felt from the beginning when she got to the police station that she was not free to leave. Didn't she state on the videotape itself, during the initial questioning, that she had acknowledged that she agreed to come to the station and talk to the police? Exactly. Didn't she herself make that acknowledgement? Well, that's in like the first five minutes, I believe Judge Schust and I pointed that out. The officer does go back and reviews, you came here voluntarily, you know, we gave you, do you want anything to eat, are you comfortable? At the time that they take the smoke break, which is well before the Miranda warnings, at that point, and there is testimony that the other officers who accompanied her out were also smokers, so they've gone out. It's also, you know, late evening in the police station, so getting her in and out of the building, you know, to go out and take the smoke break, she would have had to have been accompanied, you know, because she is on one of the higher floors. And it's in a conference room, not a small, you know, closed-in interrogation room. But anyways, when she goes out for that smoke break, she sees Taylor, her daughter, on a bench with Howard, her brother-in-law, and her brother. And that's when she makes the comment about, you know, she's getting bitten by mosquitoes. But the reason she's out there getting bitten by the mosquitoes is because she's with her family members who are also smokers and on a separate smoke break. So she sees her daughter with her family members. She knows that Taylor is being cared for by family at the police station. Now, let's talk about the post, when Miranda was taken. At that point, she had been awake for more than 18 hours, correct? Yes. And at that point, they had been questioning her for somewhere around 6 1⁄2 hours, correct? No, I don't think so. You don't think so? I believe, let's see, the Miranda, I think it was, I think the smoke break was like an hour, an hour and a half, and then I think Miranda was 20 minutes or 30 minutes after that. The break was an hour or an hour and a half? Is that long? No, no. It was an hour or an hour and a half after the interview had started. The break was probably 15 minutes or so. I don't believe it was that long. You can check my times on that. But there was a period of time between the smoke break and then the Miranda's, and then the tenor of the questions actually changes to more less investigative and more accusatory or interrogatory. After, there's another break where the door to the interview room opens. Someone comes in and brings some papers. One detective goes out and gets some papers. And it's after they come back into the room at that point that it truly, you know, the tenor of the questions begins to change. They had called the secretary. I believe so. I mean, they don't say that, but I assume and I think that's a fair inference on what had happened. So you don't see a problem with the fact that she was awake more than 18 hours that she was tired? Well, she was tired. I think the detectives were tired, but it's not obstructive. There's no mumbling or stumbling over words. She was offered something to eat and drink. You know, she's never asked for any sort of relief or break. She never says outright, okay, I'm just done. I'm tired. I want to go get Taylor and go home. She never makes that assertion. There's a number of opportunities where Taylor is mentioned, and she doesn't voice any concern about, you know, I list them in my brief where, you know, there's no, you know, suggestion, oh, I need to take her home. So, you know, she's mentioned a number of points where there's no concern expressed by her. And as I said, the police never say, you know, no, you can't go home. She never asked directly to go home. Okay. At the time, though, the police did question, if you read the record, question her post-Miranda at least or discussed, brought up the child's name at least eight times post-Miranda. How is that not a coercive tactic in getting a confession from the child? Well, I think Justice McClaren made an important distinction where she's not being threatened with termination of parental rights. They're not threatening to take Taylor away from her forever. In fact, they reassure her that Taylor is doing okay and, you know, that they're, and say, you know, when she expressed the fear that she'll never see her daughter again, they say, no, no, that's, you know. So I think their statements are more realistic assessments. At this, at the point where those type of statements are made, she has indicated that she shot her father. You know, unless they clear up what's happening, you know, that's a big statement to think that she's just going to walk out. Did she ever change her account of the events? No. She provides some details such as, you know, they're investigating where the truck went, but she sticks with the fact that, you know, her dad shot himself and that there was a struggle for the gun. She doesn't say, you know, I shot him or that. And as I pointed out, she never implicates either Chuck or her brother, which is where the police are going. So, you know, had she truly been overborn and, you know, just saying anything that they wanted to hear to get out of there, she would have implicated somebody else. How about the photograph, the gruesome photograph? That is one. Can I? You're going to answer. OK. That is one photograph out of a multitude. The judge at the time had said, you know, I think you deserve to put in one photograph. I don't think you need to do it right now. We'll do it later. At the time that photograph was entered, weren't there other charges pending? There were. There was dismemberment of the body, which was directed out. And prior, when those photos were being evaluated and that was admitted, that was existing at the time. At that point, did the state ask leave to withdraw that photo? The defense did not ask leave to withdraw that photo later after that was done, nor did the state. The judge did say in order to understand some of the coroner's testimony, considering, you know, about taking the layers off of the body and the different hiding methods, you know, what he had to do to get to the body to do the autopsy. He said, you know, you could put in one photo. This is, you know, farther away than many of the other photos that were available, so it's less gruesome. All it does is illustrate for the jury the scene of the crime. I don't think it deserves a reversal. Thank you. Mr. Johnson. Thank you. Counsel, I have two quick follow-up questions. Is it not true that on the videotape initially during the initial questioning, the defendant acknowledged that she came voluntarily to the station to talk to the police? Did she not make that acknowledgement? The term voluntarily isn't used. I understand what you're saying. Right. Maybe she didn't say I volunteered, but did you agree to come here and she said yes? The context is no one dragged you here, no one forced you here, those types of things. So while no, she didn't say, no, I don't want to be here and you guys made me, you cuffed me and brought me here. She didn't say that. But I submit to you that with the show of force that came upon her, she was intimidated and she realized very quickly I need to tell them, I need to talk to them. I'm not making the calls here. Well, couldn't she have said, though, everything you're saying, yes, but I didn't feel like I had a choice? She certainly could have said that, couldn't she, if that was the case? She could have said that, I suppose, but that's why the case law isn't that clear in black and white, because she did try to say something in her way. She said, my daughter needs to go to bed soon. I mean, that was her way of saying, okay, let's talk about me getting out of here. On that specific, we've been going around on this issue, and I think it's a legitimate point, of whether or not the statements or admissions she made subsequent to the colloquy about Taylor needing to go home, her statements seem to be consistent with the admissions that she made before that colloquy took place. There are admissions and incriminating statements from her throughout this. Right, but that's my point. What is your position? Assuming for the sake of the argument that the issue of Taylor had some impact on her making these admissions subsequent to that discussion about Taylor, if she makes admissions that are consistent with the admissions she makes after the discussion about Taylor, what would preclude their disability? Well, if statements are made after the discussions about Taylor? Well, she makes them before, and she makes them after. So what would preclude the first statements? What would preclude those statements that are consistent with the later statements allegedly after this course of conversation? Why would those be inadmissible? Well, I believe the first portion is inadmissible because she's not Mirandized. But she's not Mirandized at that point. Right. So you're submitting that one of the considerations with respect to custodial interrogations, that we should focus on that and find that this was a custodial interrogation, not a non-custodial interrogation. I believe that it was a custodial interrogation. Because why? For all the reasons I stated, because she's taken from her driveway and she's put in, she rides in the police officers, they're around her, and she does not feel she's free to leave. And then she has to leave, basically by saying Taylor has to go to bed. But even if the court didn't believe that, on page 111, and this is, I think the record needs to be clearly reviewed because there have been statements that I must respectfully disagree with about what was said. On page 111, she asked to leave. That's pre-Miranda. So up to that point, I believe at that moment, certainly the whole statement becomes involuntary. So she's in a custodial interrogation without Miranda, certainly, up to page 111, and then it's all involuntary after that. But you have a two-prong attack. Absolutely. It was custodial from the beginning and then it was court. However, it asks me a difficult point of question. If we were to find that this was not a custodial interrogation prior to the fact that you had this conversation about Taylor and she wants to leave, would that not be admissible? The statement, I suppose the statements, if you were saying this wasn't a custodial interrogation, then the statements up to page 111. Would they not be admissible? If you found that they were in, I believe they would be involuntary also, but if you found that they were. Well, we don't find that they're custodial. We either agree or disagree with whether or not the manifest way to the evidence supports a finding. So. Yes. Your argument is addressed. The problem I'm having with your argument is it seems to me that you're addressing us as if we have the ability to review this de novo and that we're going to re-weigh or reconsider the evidence. And that isn't what's going to happen. And so when you talk about us finding, I like to use the term, we determine whether or not it's against the manifest way to the evidence. The trial court may find this. I understand that, Your Honor. Thank you. You have six factors, six relevant factors concerning custodial interrogation. You're telling us that there was one factor, really one, maybe two factors, in your opinion, that are relevant to her, the way she was picked up by the police. But there was not any other indicia of any formal arrest. I mean, no physical restraints, no booking, no fingerprinting, nothing like that. There was those specific things there were not, but there were indicia of formal arrest in that she was placed in a police officer and taken to the police station. There was a show of force. And one of the officers, I believe it was Officer Anderson, said, we need to investigate. Please come with us. So there's a need there which makes it, I believe this is stronger than the Ocampo case out of this district, where all they had there out in a public place was a show of force with a few officers. And then they said, we need to talk to you. I think they said, hi, we'd like to talk to you regarding missing persons, didn't they? In this case? Yeah. We need to investigate. We'd like to talk to you regarding missing persons. We'd like to talk to you about missing persons. The need is there. Okay. Any other questions? We'll put that. Thank you. You may close for time. The bell went off. I don't know if you heard it or not. Yes, I heard it. Do you want to, can we have you address the photographs since you didn't get to address that in the beginning? Sure. Certainly it's an argument that's frequently made. I think it was made here and we submitted it because there is a difference here from the normal argument about gruesome photos. In fact, the judge said that he was a little concerned about this because we're talking about grotesque pictures involving maggots and a decaying human body that just seemed to go over the top. So when we're talking about maggots, when we're talking about those types of things that didn't seem far, far more prejudicial than probative with considering all the other pictures, that yes, it was only one picture, but it was gruesome. And for that reason, the conviction should be reversed. We'll take the case under advisement.